Filed 8/19/21  P. v. Johnson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C086308 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE002027) |
| v. | |
| JAMES EDWARD JOHNSON, | |
| Defendant and Appellant. | |

During a domestic dispute, defendant James Edward Johnson hit the mother of his daughter in the face, breaking her jaw.  At trial, an expert on domestic violence testified that his mentor on the subject of domestic violence estimated about two percent of alleged victims lie to the police when it comes to domestic violence reports.  After the trial, a juror came forward to complain she had been bullied by other jurors; this juror and other jurors also recounted how the bailiff gave them advice regarding deliberations.

1

Defendant was convicted of corporal injury on a dating partner (Pen. Code, § 273.5, subd. (a))[1] and battery with serious bodily injury (§ 243, subd. (d)) with enhancements for personally inflicting great bodily injury (§§ 12022.7, subd. (e), 1192.7, subd. (c)(8)). After the jury sustained strike and prior prison term allegations (§§ 1170.12, 667.5, subd. (b)), the trial court imposed an 11-year state prison term.

On appeal, defendant contends the trial court erred in denying a new trial motion based on juror and bailiff misconduct, counsel was ineffective in litigating the new trial motion, the matter should be remanded for a hearing on his ability to pay certain fines and fees pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), and the court erred in imposing the same prison prior twice. In a supplemental brief, he contends the expert testimony on the probability of false complaints deprived him of a fair trial, counsel's failure to object to this testimony was ineffective assistance, and the prison prior should be stricken pursuant to Senate Bill No. 136 (Senate Bill 136).

The materials submitted in support of the new trial motion do not support a finding of juror misconduct; while the bailiff committed misconduct, the prosecution overcame the presumption of prejudice. Counsel's actions regarding the new trial motion did not constitute ineffective assistance. While imposing the prison prior twice was erroneous, the elimination of the prison prior pursuant to Senate Bill 136 moots any claim. Although the expert testimony was improperly allowed, the error is harmless. Disagreeing with *Dueñas*, we shall remand with directions to strike the prison prior and affirm in all other respects.

---

[1]     Undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

*The Incident*

Defendant and L.M. were in a relationship for about two years and had a daughter, J.M., in 2016.

On December 23, 2016, defendant spent the day at L.M.'s apartment with L.M., J.M., and L.M.'s three-year-old son, D.M. He left to buy diapers and later returned. Upon his return, defendant and L.M. began arguing after he started calling her names.

L.M. texted her roommate Tatiana Rodrigues that defendant was acting crazily and had to leave; she asked Rodriguez to come home early from a Christmas party. Rodrigues, who consumed alcohol at the party and was feeling "buzzed," returned home to find defendant, L.M., and J.M. in the living room. Defendant accused L.M. of cheating on him, which she denied.[2] Rodrigues and L.M. repeatedly told defendant to leave the apartment, but he refused and got more agitated.

Rodrigues went to the kitchen and told defendant she would call someone to make him leave the apartment. She grabbed a knife; defendant walked toward Rodrigues as she held the knife in her hand. Pointing the knife at him, Rodrigues told defendant he needed to leave. According to Rodrigues, she put the knife down and never left the kitchen with it because she knew from experience that using a knife was not the right way to scare a person or get the person to stop what he or she is doing. Rodrigues never told the police about the knife because she had a prior felony conviction for domestic violence and was afraid to tell them.

---

[2]    According to L.M., defendant had told her in March 2016 that he got another woman pregnant. While he later denied this, the pregnancy became a big issue that upset L.M. and caused further arguments. However, she did not recall arguing about it on December 23. Rodrigues testified that on December 23 she heard defendant and L.M. discussing him getting another woman pregnant.

L.M., who was holding J.M., gave her daughter to Rodrigues because she was afraid defendant was going to hit Rodrigues. Defendant backed Rodrigues against the wall and tried to take the baby from her, but she held on. She did not give the baby to defendant because he was not "in the right state of mind."

According to Rodrigues, defendant "kept flexing," balling his fist, and threatening to do something as he walked up. Afraid defendant would hurt her baby, L.M.—who was on the phone with her sister—pulled defendant on his clothes to get him away from Rodrigues. Defendant turned and punched L.M. in the jaw, causing her to fall down. Immediately thereafter, defendant said "Fuck" a few times, grabbed his belongings, and left.

Rodrigues called 911; officers arrived shortly after and took statements from L.M. and Rodrigues. Rodrigues cooperated, while L.M. was crying uncontrollably when the officers arrived. An officer saw swelling on the right side of L.M.'s lower lip and a small cut. L.M. declined the officer's offer for medical treatment.

L.M. sought medical treatment a week later, as the swelling remained and her lip turned purple. Her jaw was fractured in multiple places. It required surgery, rebreaking her jaw, and putting a plate in her chin. L.M.'s jaw was wired shut for six weeks following her surgery.

L.M., who was 19 at the time of the trial, still loved defendant.

*Prior Misconduct*

Once, when she was pregnant with defendant's daughter, defendant hit L.M. so hard in the face that she urinated on herself.

On August 8, 2016, L.M. called the police after defendant pushed her, causing her head to hit a wall. Defendant left the apartment before the police arrived.

L.M. called the police on December 10, 2016, after defendant acted crazily, kicked a door open, and struck her over 20 times during the day. Defendant left before the police arrived. L.M. declined medical treatment.

4

*Expert Testimony*

David Cropp, a retired Sacramento Police detective who worked for a domestic violence crisis center, testified as an expert on domestic violence.

It is common for domestic violence victims to stay in relationships with their abusers. Victims often feel guilt following the arrest of the abuser; they can also fear leaving the relationship. In his experience, over 60 percent of domestic violence victims return to their abusers.

Domestic violence victims often distrust law enforcement, making them reluctant to cooperate with law enforcement or the criminal justice system. This happens because abusers often return home after the arrest with worsening abuse. They are also suspicious of a criminal justice system which often pits the victim against an intimate partner.

There are instances where a victim exaggerates a report of domestic violence, for example out of anger against the partner. It is difficult to find statistics on the percentage of victims who make false reports, although there is no indication that domestic violence victims lie to police at a higher rate than other crime victims. Cropp's mentor on domestic violence estimated that about two percent of victims lie to police when making a domestic violence report.

*Defense*

Testifying on his own behalf, defendant recalled first meeting L.M. on March 20, 2015. He was six feet tall and weighed between 180 and 190 pounds, while L.M. was five feet six inches tall and weighed 150 pounds.

He admitted punching L.M. in self-defense after she attacked him from behind while he was saying goodbye to their daughter, who was being held by Rodrigues. Although Rodrigues had threatened to stab him while demanding he leave the apartment, defendant remained calm and never raised his voice. Rodrigues was holding an eight-inch kitchen knife in one hand and the baby in the other when defendant struck L.M. He never committed any of the alleged acts of prior misconduct against L.M.

5

According to defendant, he spent the whole day with L.M. on December 23. They had sex in the morning and engaged in good conversations during the day. After Rodrigues left the apartment to go to a Christmas party, L.M. told defendant she did not want Rodrigues to live with her and wanted defendant to move in; defendant said he would move in with her. L.M. got upset with defendant that evening when he told her that he got another woman pregnant, with the baby due later that month. L.M. initially did not believe him; she started crying and said defendant never gave their daughter a chance, he never loved L.M., and he had cheated on her.

Rodrigues, who had obviously been drinking, returned to the apartment about 30 minutes before defendant left. Rodrigues and defendant started arguing, with Rodrigues eventually telling defendant to get out. After defendant told Rodrigues it was L.M.'s place and he was not going to leave, Rodrigues called someone to force him to leave. Defendant decided to leave after L.M. eventually told him to go. He asked for J.M. so he could kiss his daughter before leaving, but L.M. refused.

Rodrigues then came out of the kitchen with an eight-inch knife and told defendant to leave. Rodrigues eventually took J.M. from L.M. and walked into the living room with a knife in her hand. Defendant, concerned for J.M.'s safety, told Rodrigues to give him his daughter.

L.M. got on Rodrigues's phone. Defendant followed Rodrigues into the living room and told her to give him J.M. Defendant was then hit from behind. He did not remember his hair being pulled or how many times he was hit; he was not injured. Defendant reacted by turning around and striking L.M. in the face in self-defense. Before he was struck, defendant had been facing Rodrigues, who had the knife in her hand.

Hitting L.M. in the face was a self-defense accident. He had punched her hard by the time defendant realized what happened. After L.M. fell to the ground, screamed, cried, and held her face, defendant panicked, grabbed his phone and sweater, and left.

6

Sacramento Sheriff's Deputy Noah Luger responded to the August 2016 incident, following a report that defendant had vandalized L.M.'s apartment and refused to leave. Arriving about 90 minutes after the 911 call, he spoke with L.M., who said that defendant had pushed her with both hands, causing her to fall backward and onto her buttocks. She had no visible injuries, reported no pain, and did not require medical attention. L.M. did not mention defendant breaking into her apartment, and there were no signs of forced entry.

Sacramento Police Detective Binh Vu interviewed L.M. about the charged incident. L.M. told Detective Vu that she had been hit on the left side of her chin; she did not indicate misunderstanding the difference between left or right or being confused.

DISCUSSION

I

*Juror and Bailiff Misconduct*

Defendant contends the trial court erred in denying his motion for a mistrial based on juror and bailiff misconduct. We disagree.

A. *Background*

Jury deliberations started on June 21, 2017, at 3:20 p.m., until the jury retired at 4:00 p.m. Deliberations continued the next day from 9:00 a.m. to 4:00 p.m., with an hour for lunch and a 20-minute break.

At 10:34 a.m. on June 22, the jury requested the transcripts of L.M.'s testimony about her actions right before she was hit and defendant's testimony regarding "the moment he was hit from behind through the punch." At 3:40 p.m. that day, the jury informed the court it was deadlocked and asked for additional instruction on self-defense. After discussing the matter with counsel, the trial court responded to the jury's note after deliberations resumed on the following day. Shortly thereafter, the jury asked the court

7

whether a reflex can be willful and whether a willful action can be premeditated or "in the moment of decision."

The court met with counsel and defendant to address this question and the court's contact with Juror No. 4. When Juror No. 4 approached the judge in the hallway, he directed the juror to contact the bailiff. After speaking to the juror, the bailiff informed the court that Juror No. 4 believed there was a non-deliberating juror, who apparently formed an opinion about the case and made reference to Black Lives Matter. The court questioned the foreperson, Juror No. 5, who was aware of the belief that one juror was not deliberating. According to the foreperson, while the juror who allegedly was not deliberating was very clear that her mind was made up after deliberations got verbally heated, she said her mind was open. The foreperson also related that some of the other jurors were very frustrated, while the juror in question said that she did not want to be on the jury. The court told the foreperson the jury could continue deliberating and it would address the latest question in writing.

The trial court responded to the jury's communication at 11:05 a.m. At 3:25 p.m., the jury told the court that Juror No. 5 had asked not to be the foreperson. The court was subsequently told that Juror No. 7 was the new foreperson. The jury reached its verdict at 3:55 p.m. The jury was polled and affirmed its verdict.

On June 26, 2017, following the jury trial on the prior conviction allegations "Jane Doe" sent a communication to jury customer service stating she was bullied and told that if she did not vote guilty she could be tried for jury misconduct and go to jail. This juror also said that, when polled, the court did not tell the jurors that they could have said not guilty rather than guilty.

On August 24, 2017, the defense filed a new trial motion supported by defense investigator reports. The motion alleged the bailiff improperly told jurors how to deliberate, and a juror intimidated another juror during deliberations by threatening her

8

with sanctions for misconduct if she did not deliberate with the other jurors. An attached investigator's report related the contents of an interview with Juror No. 2.

The report related that the juror threat followed a heated exchange where the foreperson yelled at Juror No. 2 and called her a liar. During a break, there was an encounter in the hallway in which one of the jurors, an older man in his 60's who smoked, told Juror No. 2 that she "was making things difficult and that [she had] to go along with them or [she] could be charged with jury misconduct." This scared her and caused Juror No. 2 to question herself because she did not want to go to jail. Juror No. 2 said that four jurors bullied her: the foreperson, the older man, and two other jurors. She alleged that they yelled at her, called her stupid, always shot her down, and told her she did not know what she was talking about. She also heard another juror make a racist statement during L.M.'s testimony and during deliberations.

Juror No. 2 said she had another heated argument later that day, this time about whether defendant actually broke L.M.'s jaw. Following the argument, she left the jury room crying. When the bailiff walked by, Juror No. 2 told the bailiff she wanted to be removed from the jury because everyone was attacking her mercilessly, saying mean and racist things. The bailiff replied she couldn't be removed because it would not be fair to the defense or the prosecution. He told her "to just stay strong." The bailiff asked Juror No. 2 if she was the "only one" and said she should stay with her gut and just stay strong. Juror No. 2 did not believe anyone else heard this conversation. She did not believe defendant was guilty when she voted guilty.

A second attached report related interviews the defense investigator conducted with Juror No. 7 and Juror No. 8. Both jurors related that they heard no derogatory or racist statements during deliberations. According to Juror No. 7, Juror No. 2 once stated "she did not want to be a White female convicting a Black man. She also brought up the Black Lives Movement and police brutality against Blacks in Detroit." Juror No. 7 described Juror No. 2 as a closed-minded person who did not want open discussion. She

thought Juror No. 2 felt bullied because the other jurors insisted she look at the instructions and explain her thought process, which they did with all of the jurors. Juror No. 8 related that the first foreperson was really pushy toward Juror No. 2, and that Juror No. 2 had difficulty expressing herself. She thought the first foreperson's treatment of Juror No. 2 was "bullying."

Juror Nos. 7 and 8 both related that Juror No. 7 became the new foreperson following heated discussions. Juror No. 8 related that Juror No. 7 took a different approach, allowing Juror No. 2 to explain herself, and calmed her down when Juror No. 2 claimed she was bullied and started to withdraw from the process. Juror No. 7 said that following the jury's unanimous vote of guilty, she asked Juror No. 2 to explain why she changed her vote, and Juror No. 2 gave her reasons. The jurors then took a break and on return reaffirmed their guilty votes.

According to Juror No. 7, the bailiff told the jurors to "go around the room and voice your opinions without jumping on each other. He told us to hold up a hand when done voicing an opinion so the next juror knew when to begin voicing an opinion." Juror No. 8 said the bailiff suggested they "go around the room and give opinions and then maybe do it a second time. He never told us how to deliberate."

The prosecution filed an opposition asserting the motion should be denied because the summaries of the interviews with the jurors contained many statements regarding the jurors' thought processes that were inadmissible under Evidence Code section 1150. The opposition further argued that Juror No. 2's description of the deliberations did not support a mistrial because several claims were not substantiated and heated discussion was not misconduct. The prosecutor also argued the bailiff's actions, even if misconduct, was not prejudicial, and that an evidentiary hearing was unnecessary in light of the inadmissible evidence and lack of prejudice.

Defendant filed a supplement to the new trial motion with declarations from Juror Nos. 2, 7, and 8, along with the bailiff, Deputy Brown. The juror declarations essentially

10

adopted their previous statements to the defense investigator. Juror No. 7 added the observation that Deputy Brown gave the jury advice on deliberations after Juror No. 2 spoke to him and asked to be removed from the jury. Juror No. 8 added that, during deliberations, Deputy Brown suggested they "go around the room and give opinions and then do it for a second time after everyone has heard everyone's reasons for their verdict."

Deputy Brown's declaration stated he remembered seeing a red-haired juror leaving the jury room crying during a break. The juror told him she did not feel like she could talk and she was being bullied. The foreperson was standing with them as Deputy Brown locked the jury room door. Deputy Brown "told the juror it shouldn't be this hard and if she had something to say she should tell the foreperson. [He] then told the foreperson she needed to take charge of the jury." He mentioned this incident to the judge and thought he also told both attorneys.

Deputy Brown gave a supplemental declaration stating: "The red haired juror came out of the jury room crying. I asked her why she was crying and she told me she didn't feel like she could talk and that the other jurors were mad at her. The jury foreperson to[ld] me everything was fine. The red haired juror said it was not good. I told all of the jurors that everyone has a right to voice their opinion. I told them to go around the room and talk to everyone without jumping on each other. I told the jury foreperson it was her job to facilitate it. The jury foreperson might have asked me how she should do that. I told her something similar to having each of the jurors raise their hand, like in school, when they are done voicing their opinion."

Deputy Brown did not recall suggesting to the jurors that they should give their opinions a second time. The red-haired juror never told him she wanted to be removed from the jury. He remembered giving a pep talk to this juror, telling her something like, "Don't let it get to you. Stay strong." This happened very quickly in front of all of the jurors.

11

On November 3, 2017, the prosecutor subsequently told the court the People did not contest the information in Deputy Brown's declarations, so there was no need for an evidentiary hearing to determine his credibility. The trial court then asked the parties to confer and determine whether an evidentiary hearing was needed.

At the December 8, 2017 hearing on the motion, defense counsel did not renew his request for an evidentiary hearing. Counsel instead argued that a new trial was warranted based on the bailiff's improper communications with Juror No. 2 and Juror No. 2's assertion she had been coerced and bullied into voting guilty. The defense asserted both points, either individually or collectively, raised a presumption of prejudice which the People needed to rebut.

The trial court noted that the declarations of the jurors and Deputy Brown shared "a certain consistency." It found the descriptions "similar enough to where I think it took place and it took place in the circumstances described by both Deputy Brown—and the juror."

The prosecutor conceded Deputy Brown's contact with the jurors was presumptively prejudicial, but argued it was harmless because it did not substantially influence the jury, and Juror No. 2's claim of being bullied into a guilty verdict was contradicted by the record.

Following additional argument, the trial court denied the motion, finding the bailiff's comments to Juror No. 2 and to the jury, while improper, were not prejudicial as they either reaffirmed jury instructions on the importance of each juror's own opinions, or were directed at keeping the deliberative process as uncoercive as possible. The court found that many of the statements in Juror No. 2's declaration involved her mental process. While the deliberations were contentious, such a deliberation is not misconduct. Juror No. 2 had two opportunities to contest her guilty verdict, and did not avail herself of either opportunity. The court concluded that there was not a substantial likelihood that

12

what happened during deliberations would have impacted the verdict, and accordingly denied the motion.

B. *Analysis*

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.)

A motion for a new trial may be granted on the ground of juror misconduct. (§ 1181, subds. 2, 3, 4.) "In ruling on a request for a new trial based on jury misconduct, the trial court must undertake a three-step inquiry. [Citation.] First, it must determine whether the affidavits supporting the motion are admissible. (Evid. Code, § 1150.) If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.] Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial. [Citations.]" (*People v. Dorsey* (1995) 34 Cal.App.4th 694, 703-704.) Misconduct "raises a presumption of prejudice '[which] the prosecution must rebut . . . by demonstrating "there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment." ' [Citation.]" (*In re Boyette* (2013) 56 Cal.4th 866, 892.)

Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

13

"This statute distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . .' [Citation.] 'This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.' [Citations.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1261.)

When jury misconduct is alleged, a trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegation. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415, 419.) However, a "defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Id.* at p. 415.) "[A]n evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." (*Id.* at p. 419.)

An appellate court reviews independently the determination of prejudice arising from juror misconduct, but the trial court's credibility determinations and factual findings are reviewed under the more deferential substantial evidence standard. (*People v. Nesler* (1997) 16 Cal.4th 561, 582 & fn. 5.)

Defendant asserts, and we agree, that the bailiff's comments to Juror No. 2 and the jury were misconduct. Resolving conflicts between jurors is for the trial court or the jurors themselves; any instruction on how to deliberate or how to address juror conflicts must come from the trial court. (See *People v. Hutchinson* (1969) 71 Cal.2d 342, 351 [bailiff cannot make remarks that would improperly influence the verdict].)

We disagree with defendant's contention that the trial court erred in finding the bailiff's misconduct was not prejudicial. We agree with the trial court that the bailiff's

14

statements to the jury as a whole regarding how to deliberate and the statements to Juror No. 2 regarding standing her ground, while improper, were not prejudicial. The bailiff did not tell the jury or Juror No. 2 how to vote and did not give an opinion on the strength of the case or defendant's guilt or make any other statement likely to sway a juror's vote. (See *Parker v. Gladden* (1966) 385 U.S. 363, 363-364 [17 L.Ed.2d 420] [bailiff told a juror the defendant was "wicked" and "guilty" and later told the juror the Supreme Court will correct it if anything went wrong].)  Rather, he gave the jury advice on how to conduct a potentially less contentious and fairer deliberation, and told Juror No. 2, apparently the lone holdout in favor of not guilty, to stick to her guns.  The trial court correctly found the People overcame the presumption of prejudice.

Defendant claims the court failed to discuss the factual dispute presented by the bailiff's and Juror No. 2's declarations.  Juror No. 2 declared she asked the bailiff if she could be removed and he told her she could not.  The bailiff admitted having an encounter with Juror No. 2 but denied that she told him she wanted to be removed from the jury.  He contends the trial court had to resolve which account was more credible before determining whether misconduct occurred if the bailiff told Juror No. 2 she could not be removed and failed to tell the court she wanted to be removed from the jury.  Defendant further claims that if Juror No. 2's statement regarding her communications with the bailiff was found credible, the People would be unlikely to overcome the presumption of prejudice.

Defendant's claims regarding the bailiff allegedly telling Juror No. 2 she could not be removed from the jury or failing to tell the trial court about this juror's request were forfeited because they were not raised in the trial court.[3]  (*Phillips v. Campbell* (2016)

---

[3]     In discussing the prejudice from the bailiff's communications, the prosecutor addressed the bailiff's communications about deliberations and did not address the bailiff's communications with Juror No. 2.  When asked why he thought the bailiff's

15

2 Cal.App.5th 844, 853 [points not raised in the trial court will not be considered on appeal].) The remaining claims regarding the bailiff's comments and the contentions regarding Juror No. 2 being bullied do not warrant an evidentiary hearing, as we agree with the trial court that there were no material disputed issues of fact.

Defendant asserts the trial court failed to specifically evaluate the threat made by the older juror who smoked and allegedly threatened Juror No. 2 that she could be charged with jury misconduct if she failed to go along with the other jurors. "[J]urors, without committing misconduct, may disagree during deliberations and may express themselves vigorously and even harshly: '[J]urors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means.' [Citation.] During deliberations, expressions of 'frustration, temper, and strong conviction' may be anticipated but, in the interest of free expression in the jury room, such expressions normally should not draw the court into intrusive inquiries. [Citations.]" (*People v. Engelman* (2002) 28 Cal.4th 436, 446.) Thus, a threat to kill a fellow juror that caused the threatened juror to vomit was not misconduct. (*People v. Keenan* (1988) 46 Cal.3d 478, 539-542.) As the Supreme Court noted when finding the death threat was not misconduct, even if the outburst "was particularly harsh and inappropriate . . . no reasonable juror could have taken it literally. Manifestly, the alleged 'death threat' was but an expression of frustration, temper, and strong conviction against the contrary views of another panelist." (*Id*. at p. 541.)

The same view applies here. There is no evidence the juror who allegedly made the threat had any connection to law enforcement or the justice system. A threat that a juror could be prosecuted for misconduct coming from a lay juror should not be taken literally. It is an expression of frustration that is not misconduct. Juror No. 2's remaining

conduct was prejudicial, defense counsel did not address the prejudice about the bailiff's communication with Juror No. 2 about being removed from the jury and the bailiff not informing the trial court about this conversation with the juror.

declarations regarding feeling bullied either involved expressions of frustration from fellow jurors that were not misconduct or involved inadmissible statements regarding a juror's thought process. The hearsay statements regarding another juror's alleged racism did not require an evidentiary hearing or additional inquiry from the trial court. (*People v. Avila* (2006) 38 Cal.4th 491, 605 [hearsay is generally insufficient to trigger court's duty to investigate juror misconduct].)

We find the trial court acted within its discretion in declining to hold an evidentiary hearing, and find no error in its findings regarding misconduct or prejudice.

II

*Ineffective Assistance:  Juror and Bailiff Misconduct*

Defendant contends trial counsel was ineffective in conducting the new trial motion based on juror and bailiff misconduct. His claim is based on trial counsel's failure to specifically raise the alleged racist statements by one of the jurors, the prejudicial effect of a juror telling Juror No. 2 she could be charged with misconduct if she did not go along with the jury, and the bailiff's failure to inform the trial court and the attorneys that Juror No. 2 was upset and wanted to be removed.

A claim of ineffective assistance requires defendant to show substandard performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-692 [80 L.Ed.2d 674, 693-696] (*Strickland*).) To establish prejudice, "the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'  [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

We already concluded in our analysis of the new trial motion that the alleged racist statements and the alleged threat from another juror were not misconduct warranting a new trial. Likewise, even if we were to accept Juror No. 2's statement that she told the

bailiff she wanted to leave the jury, there is no evidence of prejudice.[4]  Juror No. 2 never told any other juror she wanted to leave, and never tried to send a note to the trial court asking to be dismissed.  She did not express her discontent when the guilty verdict was announced, nor when she was polled and affirmed her guilty vote.  She likewise did not express any such sentiment during the jury trial on the priors.  Allowing the apparently sole juror in favor of a not guilty verdict to be dismissed would not lead to a more favorable result for defendant.  Since there is no extrinsic evidence that Juror No. 2 rendered a guilty verdict because she wanted to be dismissed but could not leave, there is no evidence defendant was prejudiced from the alleged conduct by the bailiff regarding her desire to be dismissed.

"Counsel is not ineffective for failing to make frivolous or futile motions. [Citation.]"  (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)  Requesting an evidentiary hearing or making specific arguments regarding any of the claims defendant makes here would not have led to an evidentiary hearing or more favorable result for defendant. Defendant fails under both prongs of *Strickland*.

### III

### *Dueñas*

Defendant contends remand is required for an ability to pay hearing with respect to the restitution fine and court operations and conviction assessments.  He cites in support *Dueñas, supra*, 30 Cal.App.5th 1157, which held that due process requires the trial court to stay execution of restitution fines, as well as court operations and conviction assessments, until it has held a hearing and determined the defendant has the present ability to pay.

---

[4]    At the hearing on the mistrial motion, the trial court and the attorneys agreed that they were never told that Juror No. 2 wanted to be discharged from jury service.

We join the courts concluding *Dueñas* was wrongly decided and hold that defendant was not entitled to an ability to pay hearing for the restitution fine or the conviction and operations assessments. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 322, rev. granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1060; *People v. Caceres* (2019) 39 Cal.App.5th 917, 920.) We therefore reject the contention.

IV

*Expert Testimony on False Complaints*

Defendant contends in a supplemental brief that expert testimony on the statistical probability of false complaints from alleged victims of domestic violence deprived him of a fair trial.

A. *Background*

David Cropp testified for the prosecution as an expert on domestic violence. He testified on direct that the literature suggests at least 60 percent of domestic violence victims return to their abusers, and many victims do not trust the criminal justice system.

Defense counsel asked Cropp during cross-examination if it was true that alleged victims sometimes made false or exaggerated reports. After Cropp affirmed this was true, counsel asked, "So you agree that sometimes alleged victims make false reports. Right?" Cropp replied, "I would say that. But I don't want to mislead the courtroom to suggest it happens more times than not."

The following exchange took place between the prosecutor and Cropp during redirect:

"Q. You stated you didn't want to mislead the Court; it happens more often than not.

"What were you referring to?

19

"A. Well, the statistics on how many domestic violence police reports are very difficult to find, if any.  There's no indication to suggest that victims of domestic violence lie to the police at any higher percentage than other people lie to the police, which we know occurs.

"The last, uhm, statistic that I reviewed with my mentor, Dr. Linda Bernard, on this topic was we can estimate about 2 percent of victims may actually lie to the police when it comes to domestic violence reports."

Defendant never objected to this testimony.

Near the beginning of the closing argument, the prosecutor stated the case was "all about witness credibility; who do you believe," defendant or L.M. and Rodrigues.  She later argued without objection from the defense, "And Mr. Cropp told us that less than 2 percent of all domestic violence cases actually involve the victim lying.  Less than two percent of the case out there.  Defense counsel also argued the case was about credibility, and made repeated references to L.M. lying.  Addressing Cropp's testimony, counsel asserted, "[L]ook, does that 2 percent include the August 8th incident where she misled police when she called 911 and said, he broke into my apartment?"  Counsel addressed the testimony once more, stating about L.M., "She lied.  She misled the police.  So is that 2 percent?  One of the 2 percent?  Come on.  It happens more often than that.  You expect us to believe that."

B. *Analysis*

Defendant's failure to object to the testimony forfeits his contention on appeal. (See *People v. Stevens* (2015) 62 Cal.4th 325, 333 ["the failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted"].)  We instead address his claim that counsel was ineffective for failing to raise an objection.

A claim of ineffective assistance requires defendant to show substandard performance and prejudice. (*Strickland, supra*, 466 U.S. at pp. 687-692.) To establish prejudice, "the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.]" (*People v. Maury, supra*, 30 Cal.4th at p. 389.)

The question of whether an expert can testify to the statistical probability of an alleged victim giving a false report has arisen primarily in the context of child sexual abuse. Allowing an expert to testify regarding the statistical probability of false accusation sexual abuse cases has been, with rare exceptions, rejected by the courts. (See, e.g., *Snowden v. Singletary* (11th Cir. 1998) 135 F.3d 732, 737-738; *State v. Lindsey* (1986) 149 Ariz. 472; *State v. Myers* (Iowa 1986) 382 N.W.2d 91, 92, 97-98; *State v. Parkinson* (Ct.App. 1996) 128 Idaho 29; *State v. Williams* (Mo.Ct.App. 1993) 858 S.W.2d 796, 801; *State v. MacRae* (1996) 141 N.H. 106; *State v. W.B.* (2011) 205 N.J. 588; *Wilson v. State* (Tex.Ct.App. 2002) 90 S.W.3d 391, 393; *State v. Catsam* (1987) 148 Vt. 366; *United States v. Brooks* (C.A.A.F. 2007) 64 M.J. 325, 329-330; but see *Alvarez-Madrigal v. State* (Ind.Ct.App. 2017) 71 N.E.3d 887, 892-893 [finding expert testimony that some statistics show less than two or three children out of a thousand made-up claims was not improper vouching].) California courts come to the same conclusion as the overwhelming weight of authority hold that such testimony is improper. (*People v. Julian* (2019) 34 Cal.App.5th 878, 880, 887 (*Julian*); *People v. Wilson* (2019) 33 Cal.App.5th 559, 571 (*Wilson*).)[5]

---

[5] Defendant contends his claims are not forfeited because the two California cases recognizing that an expert cannot testify about the probability of false accusations, *Wilson* and *Julian*, were decided after his trial. We disagree. *Wilson* and *Julian* did not announce newly constitutional principles, but rather applied earlier decisions from other jurisdictions and established principles of the jury's role as ultimate fact finder and evidence law. (See *Julian, supra*, 34 Cal.App.5th at pp. 885-886; *Wilson, supra*, 33 Cal.App.5th at pp. 570-572.)

We agree with *Wilson*, *Julian*, and the overwhelming majority of other jurisdictions holding such evidence inadmissible. "The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful. [Citations.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.) Although these cases involve the statistical veracity of child sexual abuse victims, the same reasoning applies to testimony about the veracity of alleged domestic violence victims. Expert testimony regarding the percentage of false claims made by a type of alleged crime victim is inadmissible. An objection to such evidence should be sustained.

Since an objection to the evidence regarding the statistical veracity of domestic violence claims should have been sustained, we must determine whether defendant was prejudiced by the improperly admitted evidence.

In *Julian*, Dr. Urquiza testified, "false allegations of sexual abuse by children 'don't happen very often.' 'The range of false allegations that are known to law enforcement or [Child Protective Services] . . . is about as low as one percent of cases to a high of maybe 6, 7, 8 percent of cases that appear to be false allegations.' " (*Julian, supra*, 34 Cal.App.5th at p. 885.) The Court of Appeal agreed with the defendant's contention that this testimony "was highly prejudicial, and deprived him of his right to a fair trial." (*Ibid.*) Defendant did not object to the evidence at trial, but the *Julian* court found counsel's ineffectiveness in failing to object deprived him of a fair trial under the *Strickland* standard of prejudice. (*Julian,* at p. 889.) The *Julian* court also found the defendant was prejudiced by trial counsel's soliciting from an investigating officer that the officer believed one of the children was truthful in making claims of sexual abuse against the defendant. (*Ibid.*) Finding these errors prejudicial under any standard of harmless error, the Court of Appeal reversed. (*Id.* at p. 890.)

Dr. Urquiza in *Wilson* "testified that there was a limited amount of research on the topic of false allegations of child sexual abuse, but that false allegations occur 'very infrequently or rarely,' most often during a child custody dispute. He continued, 'There are a number of studies that talk about the pressures put on children to make a false allegation.' He referred to a 'classic' Canadian study that found 'about 4% of cases in which there was an allegation that was determined to be false,' remarking that '[w]hat was notable [about the study] was that in none of those cases was it a child who made the allegation that was false, it was somebody else,' such as a parent disputing custody." (*Wilson, supra*, 33 Cal.App.5th at p. 568.) The expert admitted on cross-examination that it was difficult to determine whether an allegation is false, but the Canadian study was among the best available. (*Ibid.*) The expert also noted that the 12 to 15 other studies on the subject showed a range of one to six percent false allegations. (*Ibid*.)

The Court of Appeal found the testimony improperly admitted, but not prejudicial under the *People v. Watson* (1956) 46 Cal.2d 818 standard. (*Wilson, supra*, 33 Cal.App.5th at pp. 571-572.) In finding the error harmless, the *Wilson* court cited the relative brevity of the improper expert testimony, the fact that the expert acknowledged it was difficult to determine whether an allegation was false, and the expert's admission he had come across two cases where he believed the child he treated was making false claims of sexual abuse. (*Id*. at p. 572.) The Court of Appeal further relied on expert evidence submitted by the defense to rebut the improper expert testimony. (*Ibid*.) The defense expert "testified that the 4 percent number reflected only the cases in which there was positive proof a child's allegations were false, and that there was no way to know the actual ratio of true to false allegations." (*Ibid.*) The expert also noted there were many specific examples of false memories where children were influenced by adults investigating the alleged crimes or through interviewers using unreliable methods, and that false accusations are most likely to result from outside influences. (*Ibid.*) Finally, the prosecutor did not mention the statistical evidence in closing argument. (*Ibid*.) Thus,

where the two victims "testified extensively and the jurors could assess their credibility, other percipient witnesses were called, and the defense offered effective rebuttal expert testimony, we see no reasonable probability defendant would have achieved a more favorable result in the absence of the challenged testimony." (*Ibid.*)

We find this case much more like *Wilson* than *Julian*. While improper, the expert testimony at issue here was in response to a single question on redirect after the defense first asked the expert if some domestic violence claims are false. The improper statistical testimony was preceded by the expert admitting it was difficult to find such statistics and there was no indication domestic violence reports were any more likely to be false than other reports of crime. The two percent figure was not derived from numerous studies, unlike the testimony in *Wilson* and *Julian*, but was instead an "estimate" derived from the last statistic Cropp reviewed with his mentor. While the prosecutor noted the improper expert testimony in closing, she made but a single reference to it. This stands in sharp contrast to *Julian*, where the prosecutor's closing argument asked the jury to rely on Dr. Urquiza's statistical evidence to infer guilt. (*Julian, supra*, 34 Cal.App.5th at p. 889.)

Another difference between this case and *Julian* is defense counsel's attempt to diminish the impact of the probability evidence. Defense counsel in *Julian* discussed Dr. Urquiza's testimony in closing, but counsel's discussion of "the statistical percentage of false allegations in a study" was cut short by the prosecutor's objection. (*Julian, supra*, 34 Cal.App.5th at p. 889.) After a 15-minute recess, the trial court instructed the jury there was a disagreement between the lawyers about a study and it "should decide the issue based on the evidence introduced about the study, not what the lawyers remember about it." (*Ibid.*) This added to the prejudicial impact by directing the jury's attention to the statistical studies right before deliberation. (*Ibid.*)

Defense counsel here properly sought to minimize the testimony by noting instances where L.M. was untruthful and directing the jury to its proper inquiry, whether this particular witness told the truth, rather than the improper focus of the expert

24

testimony, whether such witnesses as a class were truthful. The prosecutor did not object to this argument, and there was no instruction from the court adding to the prejudicial effect of the probability testimony. Instead, the instruction relevant to the improper expert testimony was that the jury was the sole judge of the facts and credibility of witnesses (CALCRIM Nos. 200, 226) and that it was to determine the meaning and importance of the expert's testimony (CALCRIM No. 332). Defendant leaving when 911 was being called and before law enforcement could arrive is evidence of a guilty mind not present in *Julian* or *Wilson*. (See *People v. Paysinger* (2009) 174 Cal.App.4th 26, 31 [reviewing CALCRIM No. 372].)[6]

Finally, the prosecution case was stronger than the prosecution cases in *Julian* and *Wilson*. Unlike those cases, there was a witness to the charged incident who gave testimony of the event which was essentially consistent with the complaining witness. That witness, Rodrigues, called 911 shortly after defendant hit L.M. The arriving law enforcement officers were able to observe L.M.'s distraught emotional state and photographed her face, which affirmed she had been injured there. This case further differs from *Julian* and *Wilson* in that there was undisputed medical evidence that the charged incident had in fact occurred; L.M. suffered a broken jaw as a result of the incident. While defendant presented a defense, he admitted while testifying that he did strike L.M., albeit in self-defense. His testimony diminished the potentially greatest danger he faced, Rodrigues holding a knife, as he admitted that he did not call 911 even though he saw Rodrigues holding a knife and his baby at the same time, and, when asked whether the knife had been placed in the kitchen when he struck L.M., responded, "Well, it wasn't so much as a knife. It was me getting hit from behind."

---

**6** The jury instruction on flight as evidence of guilt (CALCRIM No. 372) was given in this case.

25

Defendant admitted he suffered no injuries as a result of the alleged attack from behind by L.M. He is significantly larger and stronger than her, and admitted he was not at risk from Rodrigues holding a knife. He nonetheless broke the jaw of the mother of his daughter because she allegedly struck, but did not injure him. While defendant was able to point out various inconsistencies in L.M.'s and Rodrigues' accounts of the incident, and L.M.'s account of the prior uncharged incidents, the fact remains that defendant admitted breaking L.M.'s jaw because she struck him from behind but did not hurt him.

In light of the strength of the prosecution case, it is not reasonably probable that preventing the single improper answer from the expert and the single improper reference to this answer in the closing argument would have led to a different result. Defendant has failed to carry his burden of establishing prejudice under *Strickland*, so we reject his claim of ineffective assistance.

V

*Senate Bill 136*

Defendant contends, and the Attorney General agrees, that recently enacted Senate Bill 136, which limits the prior offenses that qualify for a prior prison term enhancement, applies retroactively to his case. We agree.

On October 8, 2019, the Governor signed Senate Bill 136, which amended section 667.5, effective January 1, 2020. (Stats. 2019, ch. 590, § 1.) Senate Bill 136 narrowed eligibility for the one-year prior prison term enhancement to those who have served a prior prison sentence for a sexually violent offense.

Defendant's prior prison term at issue was not for a sexually violent offense. (See Welf. & Inst. Code, § 6600, subd. (b) [defining sexually violent offense].) Defendant is therefore entitled to the ameliorative benefit of the statute if Senate Bill 136 is applied retroactively. We agree with the parties that the amendment to Senate Bill 136 should be applied retroactively in this case.

26

Generally speaking, new criminal legislation is presumed to apply prospectively unless the statute expressly declares a contrary intent. (§ 3.) However, where the Legislature has reduced punishment for criminal conduct, an inference arises under *In re Estrada* (1965) 63 Cal.2d 740, " 'that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' [Citations.]" (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.) "A new law mitigates or lessens punishment when it either mandates reduction of a sentence or grants a trial court the discretion to do so. [Citation.]" (*People v. Hurlic* (2018) 25 Cal.App.5th 50, 56.)

Senate Bill 136 narrowed who was eligible for a section 667.5, subdivision (b) prior prison term enhancement. There is nothing in the bill or its associated legislative history that indicates an intent that the court not apply this amendment to all individuals whose sentences are not yet final. Under these circumstances, we find that *In re Estrada*'s inference of retroactive application applies. (Accord, *People v. Lopez* (2019) 42 Cal.App.5th 337, 340-342 [Sen. Bill 136 applies retroactively to cases not yet final on appeal]; *People v. Jennings* (2019) 42 Cal.App.5th 664, 680-682 [same].) Appellate courts in this situation typically direct the trial court to strike defendant's prior prison term enhancements and "remand the matter for resentencing to allow the court to exercise its discretion in light of the changed circumstances." (*Jennings*, at p. 682.) We shall do so here.[7]

---

**7** Although, as defendant points out, the trial court erroneously imposed the single prior prison term enhancement two times at sentencing, imposing it on both the principal term and imposing and staying it on the term stayed pursuant to section 654, there is no need for us to act on this error as the invalidation of the prison prior effectively moots any claim.

## DISPOSITION

The matter is remanded to the trial court with directions to strike the section 667.5, subdivision (b) enhancement and for resentencing consistent with this opinion. In all other respects, the judgment is affirmed.

       /s/              
BLEASE, J.

I concur:


     /s/            
RAYE, P. J

MAURO, J., Concurring and Dissenting.

I fully concur in the majority opinion except for part III of the Discussion, pertaining to the restitution fines and assessments. As to that portion of the opinion, I dissent.

In *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the court held it is improper to impose certain fines or assessments without determining defendant's ability to pay. (*Id*. at pp. 1168, 1172.) Although some courts have subsequently criticized *Dueñas*'s legal analysis (see, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946), *Dueñas* remains citable precedent. Until the California Supreme Court has had an opportunity to resolve the current split in authority, I would remand the matter to give the trial court an opportunity to consider defendant's ability to pay the imposed assessments. But as for the restitution fines imposed by the trial court, I would conclude defendant forfeited the challenge to the fines because they were imposed above the minimum and defendant had an opportunity to object to them in the trial court but did not.

                                     \_\_\_\_\_/s/_____
                                       MAURO, J.

1